# OVERTON, DIRECTOR, MICHIGAN DEPARTMENT OF CORRECTIONS, ET AL. v. BAZZETTA ET AL.

No. 02–94.   Argued March 26, 2003—Decided June 16, 2003

KENNEDY, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, SOUTER, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, in which SOUTER, GINSBURG, and BREYER, JJ., joined, *post*, p. 137. THOMAS, J., filed an opinion concurring in the judgment, in which SCALIA, J., joined, *post*, p. 138.

*Thomas L. Casey*, Solicitor General of Michigan, argued the cause for petitioners. With him on the briefs were *Mike Cox*, Attorney General, and *Leo H. Friedman, Mark Matus*, and *Lisa C. Ward*, Assistant Attorneys General.

*Jeffrey A. Lamken* argued the cause for the United States as *amicus curiae.* With him on the brief were *Solicitor General Olson, Assistant Attorney General McCallum, Deputy Solicitor General Clement,* and *Robert M. Loeb.*

*Deborah LaBelle* argued the cause for respondents. With her on the brief were *Barbara R. Levine* and *Patricia A. Streeter.**

JUSTICE KENNEDY delivered the opinion of the Court.

The State of Michigan, by regulation, places certain restrictions on visits with prison inmates. The question before the Court is whether the regulations violate the substantive due process mandate of the Fourteenth Amendment, or the First or Eighth Amendments as applicable to the States through the Fourteenth Amendment.

---

*Briefs of *amici curiae* urging reversal were filed for the State of Colorado et al. by *Ken Salazar,* Attorney General of Colorado, *Alan J. Gilbert,* Solicitor General, and *Juliana M. Zolynas,* Assistant Attorney General, and by the Attorneys General for their respective States as follows: *William H. Pryor, Jr.,* of Alabama, *Charlie Crist* of Florida, *Thurbert E. Baker* of Georgia, *Alan G. Lance* of Idaho, *Steve Carter* of Indiana, *J. Joseph Curran, Jr.,* of Maryland, *Mike Moore* of Mississippi, *Jeremiah W. (Jay) Nixon* of Missouri, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *Wayne Stenehjem* of North Dakota, *W. A. Drew Edmondson* of Oklahoma, *Hardy Myers* of Oregon, *D. Michael Fisher* of Pennsylvania, *Mark Barnett* of South Dakota, *Paul G. Summers* of Tennessee, *Greg Abbott* of Texas, *Mark L. Shurtleff* of Utah, and *Patrick J. Crank* of Wyoming; and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger* and *Charles L. Hobson.*

Briefs of *amici curiae* urging affirmance were filed for the American Civil Liberties Union et al. by *Elizabeth Alexander, David C. Fathi, Steven R. Shapiro, Lenora M. Lapidus, Daniel L. Greenberg, John Boston, Michael J. Steinberg,* and *Kary L. Moss;* for the National Council on Crime and Delinquency et al. by *Jill M. Wheaton;* and for the Public Defender Service for the District of Columbia et al. by *Paul Denenfeld* and *Giovanna Shay.*

*Roderick M. Hills, Jr.,* filed a brief for the National Council of La Raza et al. as *amici curiae.*

I

The population of Michigan's prisons increased in the early 1990's. More inmates brought more visitors, straining the resources available for prison supervision and control. In particular, prison officials found it more difficult to maintain order during visitation and to prevent smuggling or trafficking in drugs. Special problems were encountered with the increase in visits by children, who are at risk of seeing or hearing harmful conduct during visits and must be supervised with special care in prison visitation facilities.

The incidence of substance abuse in the State's prisons also increased in this period. Drug and alcohol abuse by prisoners is unlawful and a direct threat to legitimate objectives of the corrections system, including rehabilitation, the maintenance of basic order, and the prevention of violence in the prisons.

In response to these concerns, the Michigan Department of Corrections (MDOC or Department) revised its prison visitation policies in 1995, promulgating the regulations here at issue. One aspect of the Department's approach was to limit the visitors a prisoner is eligible to receive, in order to decrease the total number of visitors.

Under MDOC's regulations, an inmate may receive visits only from individuals placed on an approved visitor list, except that qualified members of the clergy and attorneys on official business may visit without being listed. Mich. Admin. Code Rule 791.6609(2) (1999); Director's Office Mem. 1995–59 (effective date Aug. 25, 1995). The list may include an unlimited number of members of the prisoner's immediate family and 10 other individuals the prisoner designates, subject to some restrictions. Rule 791.6609(2). Minors under the age of 18 may not be placed on the list unless they are the children, stepchildren, grandchildren, or siblings of the inmate. Rule 791.6609(2)(b); Mich. Comp. Laws Ann. § 791.268a (West Supp. 2003). If an inmate's parental rights

have been terminated, the child may not be a visitor. Rule 791.6609(6)(a) (1999). A child authorized to visit must be accompanied by an adult who is an immediate family member of the child or of the inmate or who is the legal guardian of the child. Rule 791.6609(5); Mich. Dept. of Corrections Procedure OP–SLF/STF–05.03.140, p. 9 (effective date Sept. 15, 1999). An inmate may not place a former prisoner on the visitor list unless the former prisoner is a member of the inmate's immediate family and the warden has given prior approval. Rule 791.6609(7).

The Department's revised policy also sought to control the widespread use of drugs and alcohol among prisoners. Prisoners who commit multiple substance-abuse violations are not permitted to receive any visitors except attorneys and members of the clergy. Rule 791.6609(11)(d). An inmate subject to this restriction may apply for reinstatement of visitation privileges after two years. Rule 791.6609(12). Reinstatement is within the warden's discretion. *Ibid.*

Respondents are prisoners, their friends, and their family members. They brought this action under Rev. Stat. § 1979, 42 U. S. C. § 1983, alleging that the restrictions upon visitation violate the First, Eighth, and Fourteenth Amendments. It was certified as a class action under Federal Rule of Civil Procedure 23.

Inmates who are classified as the highest security risks, as determined by the MDOC, are limited to noncontact visitation. This case does not involve a challenge to the method for making that determination. By contrast to contact visitation, during which inmates are allowed limited physical contact with their visitors in a large visitation room, inmates restricted to noncontact visits must communicate with their visitors through a glass panel, the inmate and the visitor being on opposite sides of a booth. In some facilities the booths are located in or at one side of the same room used for contact visits. The case before us concerns the regulations as they pertain to noncontact visits.

The United States District Court for the Eastern District of Michigan agreed with the prisoners that the regulations pertaining to noncontact visits were invalid. *Bazzetta* v. *McGinnis,* 148 F. Supp. 2d 813 (2001). The Sixth Circuit affirmed, 286 F. 3d 311 (2002), and we granted certiorari, 537 U. S. 1043 (2002).

## II

The Court of Appeals agreed with the District Court that the restrictions on noncontact visits are invalid. This was error. We first consider the contention, accepted by the Court of Appeals, that the regulations infringe a constitutional right of association.

We have said that the Constitution protects "certain kinds of highly personal relationships," *Roberts* v. *United States Jaycees,* 468 U. S. 609, 618, 619–620 (1984). And outside the prison context, there is some discussion in our cases of a right to maintain certain familial relationships, including association among members of an immediate family and association between grandchildren and grandparents. See *Moore* v. *East Cleveland,* 431 U. S. 494 (1977) (plurality opinion); *Meyer* v. *Nebraska,* 262 U. S. 390 (1923).

This is not an appropriate case for further elaboration of those matters. The very object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration. See *Jones* v. *North Carolina Prisoners' Labor Union, Inc.,* 433 U. S. 119, 125 (1977); *Shaw* v. *Murphy,* 532 U. S. 223, 229 (2001). And, as our cases have established, freedom of association is among the rights least compatible with incarceration. See *Jones, supra,* at 125–126; *Hewitt* v. *Helms,* 459 U. S. 460 (1983). Some curtailment of that freedom must be expected in the prison context.

We do not hold, and we do not imply, that any right to intimate association is altogether terminated by incarceration or is always irrelevant to claims made by prisoners. We

need not attempt to explore or define the asserted right of association at any length or determine the extent to which it survives incarceration because the challenged regulations bear a rational relation to legitimate penological interests. This suffices to sustain the regulation in question. See *Turner* v. *Safley,* 482 U. S. 78, 89 (1987). We have taken a similar approach in previous cases, such as *Pell* v. *Procunier,* 417 U. S. 817, 822 (1974), which we cited with approval in *Turner.* In *Pell,* we found it unnecessary to decide whether an asserted First Amendment right survived incarceration. Prison administrators had reasonably exercised their judgment as to the appropriate means of furthering penological goals, and that was the controlling rationale for our decision. We must accord substantial deference to the professional judgment of prison administrators, who bear a significant responsibility for defining the legitimate goals of a corrections system and for determining the most appropriate means to accomplish them. See, *e. g., Pell, supra,* at 826–827; *Helms, supra,* at 467; *Thornburgh* v. *Abbott,* 490 U. S. 401, 408 (1989); *Jones, supra,* at 126, 128; *Turner, supra,* at 85, 89; *Block* v. *Rutherford,* 468 U. S. 576, 588 (1984); *Bell* v. *Wolfish,* 441 U. S. 520, 562 (1979). The burden, moreover, is not on the State to prove the validity of prison regulations but on the prisoner to disprove it. See *Jones, supra,* at 128; *O'Lone* v. *Estate of Shabazz,* 482 U. S. 342, 350 (1987); *Shaw, supra,* at 232. Respondents have failed to do so here.

In *Turner* we held that four factors are relevant in deciding whether a prison regulation affecting a constitutional right that survives incarceration withstands constitutional challenge: whether the regulation has a "'valid, rational connection'" to a legitimate governmental interest; whether alternative means are open to inmates to exercise the asserted right; what impact an accommodation of the right would have on guards and inmates and prison resources; and whether there are "ready alternatives" to the regulation. 482 U. S., at 89–91.

Turning to the restrictions on visitation by children, we conclude that the regulations bear a rational relation to MDOC's valid interests in maintaining internal security and protecting child visitors from exposure to sexual or other misconduct or from accidental injury. The regulations promote internal security, perhaps the most legitimate of penological goals, see, *e. g., Pell, supra,* at 823, by reducing the total number of visitors and by limiting the disruption caused by children in particular. Protecting children from harm is also a legitimate goal, see, *e. g., Block, supra,* at 586–587. The logical connection between this interest and the regulations is demonstrated by trial testimony that reducing the number of children allows guards to supervise them better to ensure their safety and to minimize the disruptions they cause within the visiting areas.

As for the regulation requiring children to be accompanied by a family member or legal guardian, it is reasonable to ensure that the visiting child is accompanied and supervised by those adults charged with protecting the child's best interests.

Respondents argue that excluding minor nieces and nephews and children as to whom parental rights have been terminated bears no rational relationship to these penological interests. We reject this contention, and in all events it would not suffice to invalidate the regulations as to all non-contact visits. To reduce the number of child visitors, a line must be drawn, and the categories set out by these regulations are reasonable. Visits are allowed between an inmate and those children closest to him or her—children, grandchildren, and siblings. The prohibition on visitation by children as to whom the inmate no longer has parental rights is simply a recognition by prison administrators of a status determination made in other official proceedings.

MDOC's regulation prohibiting visitation by former inmates bears a self-evident connection to the State's interest in maintaining prison security and preventing future crimes.

We have recognized that "communication with other felons is a potential spur to criminal behavior." *Turner, supra,* at 91–92.

Finally, the restriction on visitation for inmates with two substance-abuse violations, a bar which may be removed after two years, serves the legitimate goal of deterring the use of drugs and alcohol within the prisons. Drug smuggling and drug use in prison are intractable problems. See, *e. g., Bell, supra,* at 559; *Block, supra,* at 586–587; *Hudson* v. *Palmer,* 468 U. S. 517, 527 (1984). Withdrawing visitation privileges is a proper and even necessary management technique to induce compliance with the rules of inmate behavior, especially for high-security prisoners who have few other privileges to lose. In this regard we note that numerous other States have implemented similar restrictions on visitation privileges to control and deter substance-abuse violations. See Brief for State of Colorado et al. as *Amici Curiae* 4–9.

Respondents argue that the regulation bears no rational connection to preventing substance abuse because it has been invoked in certain instances where the infractions were, in respondents' view, minor. Even if we were inclined, though, to substitute our judgment for the conclusions of prison officials concerning the infractions reached by the regulations, the individual cases respondents cite are not sufficient to strike down the regulations as to all noncontact visits. Respondents also contest the 2-year bar and note that reinstatement of visitation is not automatic even at the end of two years. We agree the restriction is severe. And if faced with evidence that MDOC's regulation is treated as a *de facto* permanent ban on all visitation for certain inmates, we might reach a different conclusion in a challenge to a particular application of the regulation. Those issues are not presented in this case, which challenges the validity of the restriction on noncontact visits in all instances.

Having determined that each of the challenged regulations bears a rational relationship to a legitimate penological interest, we consider whether inmates have alternative means of exercising the constitutional right they seek to assert. *Turner*, 482 U. S., at 90. Were it shown that no alternative means of communication existed, though it would not be conclusive, it would be some evidence that the regulations were unreasonable. That showing, however, cannot be made. Respondents here do have alternative means of associating with those prohibited from visiting. As was the case in *Pell*, inmates can communicate with those who may not visit by sending messages through those who are allowed to visit. 417 U. S., at 825. Although this option is not available to inmates barred all visitation after two violations, they and other inmates may communicate with persons outside the prison by letter and telephone. Respondents protest that letter writing is inadequate for illiterate inmates and for communications with young children. They say, too, that phone calls are brief and expensive, so that these alternatives are not sufficient. Alternatives to visitation need not be ideal, however; they need only be available. Here, the alternatives are of sufficient utility that they give some support to the regulations, particularly in a context where visitation is limited, not completely withdrawn.

Another relevant consideration is the impact that accommodation of the asserted associational right would have on guards, other inmates, the allocation of prison resources, and the safety of visitors. See *Turner, supra,* at 90; *Hudson, supra,* at 526 (visitor safety). Accommodating respondents' demands would cause a significant reallocation of the prison system's financial resources and would impair the ability of corrections officers to protect all who are inside a prison's walls. When such consequences are present, we are "particularly deferential" to prison administrators' regulatory judgments. *Turner, supra,* at 90.

Finally, we consider whether the presence of ready alternatives undermines the reasonableness of the regulations. *Turner* does not impose a least-restrictive-alternative test, but asks instead whether the prisoner has pointed to some obvious regulatory alternative that fully accommodates the asserted right while not imposing more than a *de minimis* cost to the valid penological goal. 482 U. S., at 90–91. Respondents have not suggested alternatives meeting this high standard for any of the regulations at issue. We disagree with respondents' suggestion that allowing visitation by nieces and nephews or children for whom parental rights have been terminated is an obvious alternative. Increasing the number of child visitors in that way surely would have more than a negligible effect on the goals served by the regulation. As to the limitation on visitation by former inmates, respondents argue the restriction could be time limited, but we defer to MDOC's judgment that a longer restriction better serves its interest in preventing the criminal activity that can result from these interactions. Respondents suggest the duration of the restriction for inmates with substance-abuse violations could be shortened or that it could be applied only for the most serious violations, but these alternatives do not go so far toward accommodating the asserted right with so little cost to penological goals that they meet *Turner*'s high standard. These considerations cannot justify the decision of the Court of Appeals to invalidate the regulation as to all noncontact visits.

## III

Respondents also claim that the restriction on visitation for inmates with two substance-abuse violations is a cruel and unusual condition of confinement in violation of the Eighth Amendment. The restriction undoubtedly makes the prisoner's confinement more difficult to bear. But it does not, in the circumstances of this case, fall below the standards mandated by the Eighth Amendment. Much of

what we have said already about the withdrawal of privileges that incarceration is expected to bring applies here as well. Michigan, like many other States, uses withdrawal of visitation privileges for a limited period as a regular means of effecting prison discipline. This is not a dramatic departure from accepted standards for conditions of confinement. Cf. *Sandin* v. *Conner*, 515 U. S. 472, 485 (1995). Nor does the regulation create inhumane prison conditions, deprive inmates of basic necessities, or fail to protect their health or safety. Nor does it involve the infliction of pain or injury, or deliberate indifference to the risk that it might occur. See, *e. g., Estelle* v. *Gamble*, 429 U. S. 97 (1976); *Rhodes* v. *Chapman*, 452 U. S. 337 (1981). If the withdrawal of all visitation privileges were permanent or for a much longer period, or if it were applied in an arbitrary manner to a particular inmate, the case would present different considerations. An individual claim based on indefinite withdrawal of visitation or denial of procedural safeguards, however, would not support the ruling of the Court of Appeals that the entire regulation is invalid.

\* \* \*

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER, JUSTICE GINSBURG, and JUSTICE BREYER join, concurring.

Our decision today is faithful to the principle that "federal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner* v. *Safley*, 482 U. S. 78, 84 (1987). As we explained in *Turner:*

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution. Hence, for example, prisoners retain the constitutional right to petition the government for the redress of grievances, *Johnson* v. *Avery*, 393 U. S. 483 (1969); they

are protected against invidious racial discrimination by the Equal Protection Clause of the Fourteenth Amendment, *Lee* v. *Washington,* 390 U. S. 333 (1968); and they enjoy the protections of due process, *Wolff* v. *McDonnell,* 418 U. S. 539 (1974); *Haines* v. *Kerner,* 404 U. S. 519 (1972). Because prisoners retain these rights, '[w]hen a prison regulation or practice offends a fundamental constitutional guarantee, federal courts will discharge their duty to protect constitutional rights.' *Procunier* v. *Martinez,* 416 U. S., at 405–406." *Ibid.*

It was in the groundbreaking decision in *Morrissey* v. *Brewer,* 408 U. S. 471 (1972), in which we held that parole revocation is a deprivation of liberty within the meaning of the Due Process Clause of the Fourteenth Amendment, that the Court rejected the view once held by some state courts that a prison inmate is a mere slave. See *United States ex rel. Miller* v. *Twomey,* 479 F. 2d 701, 711–713 (CA7 1973). Under that rejected view, the Eighth Amendment's proscription of cruel and unusual punishment would have marked the outer limit of the prisoner's constitutional rights. It is important to emphasize that nothing in the Court's opinion today signals a resurrection of any such approach in cases of this kind. See *ante,* at 131. To the contrary, it remains true that the "restraints and the punishment which a criminal conviction entails do not place the citizen beyond the ethical tradition that accords respect to the dignity and intrinsic worth of every individual." 479 F. 2d, at 712.

JUSTICE THOMAS, with whom JUSTICE SCALIA joins, concurring in the judgment.

I concur in the judgment of the Court because I would sustain the challenged regulations on different grounds from those offered by the majority.

## I

## A

The Court is asked to consider "[w]hether prisoners have a right to non-contact prison visitation protected by the First and Fourteenth Amendments." Brief for Petitioners i. In my view, the question presented, as formulated in the order granting certiorari, draws attention to the wrong inquiry. Rather than asking in the abstract whether a certain right "survives" incarceration, *ante*, at 132, the Court should ask whether a particular prisoner's lawful sentence took away a right enjoyed by free persons.

The Court's precedents on the rights of prisoners rest on the unstated (and erroneous) presumption that the Constitution contains an implicit definition of incarceration. This is manifestly not the case, and, in my view, States are free to define and redefine all types of punishment, including imprisonment, to encompass various types of deprivations—*provided only that those deprivations are consistent with the Eighth Amendment.* Under this view, the Court's precedents on prisoner "rights" bear some reexamination.

When faced with a prisoner asserting a deprivation of constitutional rights in this context, the Court has asked first whether the right survives incarceration, *Pell* v. *Procunier*, 417 U. S. 817, 822 (1974), and then whether a prison restriction on that right "bear[s] a rational relation to legitimate penological interests." *Ante*, at 132 (citing *Turner* v. *Safley*, 482 U. S. 78, 89 (1987)).

*Pell* and its progeny do not purport to impose a substantive limitation on the power of a State to sentence a person convicted of a criminal offense to a deprivation of the right at issue. For example, in *Turner*, the Court struck down a prison regulation that prohibited inmates from marrying absent permission from the superintendent. 482 U. S., at 89, 94–99. *Turner* cannot be properly understood, however, as holding that a State may not sentence those convicted to both impris-

onment and the denial of a constitutional right to marry.* The only provision of the Constitution that speaks to the scope of criminal punishment is the Cruel and Unusual Punishments Clause of the Eighth Amendment, and *Turner* cited neither that Clause nor the Court's precedents interpreting it. Prisoners challenging their sentences must, absent an unconstitutional procedural defect, rely solely on the Eighth Amendment.

The proper inquiry, therefore, is whether a sentence validly deprives the prisoner of a constitutional right enjoyed by ordinary, law-abiding persons. Whether a sentence encompasses the extinction of a constitutional right enjoyed by free persons turns on state law, for it is a State's prerogative to determine how it will punish violations of its law, and this Court awards great deference to such determinations. See, *e. g.*, *Payne* v. *Tennessee*, 501 U. S. 808, 824 (1991) ("Under our constitutional system, the primary responsibility for defining crimes against state law [and] fixing punishments for the commission of these crimes . . . rests with the States"); see also *Ewing* v. *California*, 538 U. S. 11, 24 (2003) (opinion of O'CONNOR, J.) ("[O]ur tradition of deferring to state legislatures in making and implementing such important [sentencing] policy decisions is longstanding").

*Turner* is therefore best thought of as implicitly deciding that the marriage restriction was not within the scope of the State's lawfully imposed sentence and that, therefore, the regulation worked a deprivation of a constitutional right without sufficient process. Yet, when the resolution of a federal constitutional issue may be rendered irrelevant by

---

*A prisoner's sentence is the punishment imposed pursuant to state law. Sentencing a criminal to a term of imprisonment may, under state law, carry with it the implied delegation to prison officials to discipline and otherwise supervise the criminal while he is incarcerated. Thus, restrictions imposed by prison officials may also be a part of the sentence, provided that those officials are not acting ultra vires with respect to the discretion given them, by implication, in the sentence.

the determination of a predicate state-law question, federal courts should ordinarily abstain from passing on the federal issue. *Railroad Comm'n of Tex.* v. *Pullman Co.*, 312 U. S. 496 (1941). Here, if the prisoners' lawful sentences encompassed the extinction of any right to intimate association as a matter of state law, all that would remain would be respondents' (meritless, see Part II, *infra*) Eighth Amendment claim. Petitioners have not asked this Court to abstain under *Pullman,* and the issue of *Pullman* abstention was not considered below. As a result, petitioners have, in this case, submitted to the sort of guesswork about the meaning of prison sentences that is the hallmark of the *Turner* inquiry. Here, furthermore, *Pullman* abstention seems unnecessary because respondents make no effort to show that the sentences imposed on them *did not* extinguish the right they now seek to enforce. And for good reason.

It is highly doubtful that, while sentencing each respondent to imprisonment, the State of Michigan intended to permit him to have any right of access to visitors. Such access seems entirely inconsistent with Michigan's goal of segregating a criminal from society, see *Morrissey* v. *Brewer,* 408 U. S. 471, 482 (1972) (incarceration by design intrudes on the freedom "to be with family and friends and to form the other enduring attachments of normal life"); cf. *Olim* v. *Wakinekona,* 461 U. S. 238 (1983) (upholding incarceration several hours of flight away from home).

B

Though the question whether the State of Michigan intended to confer upon respondents a right to receive visitors is ultimately for the State itself to answer, it must nonetheless be confronted in this case. The Court's *Turner* analysis strongly suggests that the asserted rights were extinguished by the State of Michigan in incarcerating respondents. Restrictions that are rationally connected to the running of a prison, that are designed to avoid adverse impacts on guards,

inmates, or prison resources, that cannot be replaced by "ready alternatives," and that leave inmates with alternative means of accomplishing what the restrictions prohibit, are presumptively included within a sentence of imprisonment. Moreover, the history of incarceration as punishment supports the view that the sentences imposed on respondents terminated any rights of intimate association. From the time prisons began to be used as places where criminals served out their sentences, they were administered much in the way Michigan administers them today.

Incarceration in the 18th century in both England and the Colonies was virtually nonexistent as a form of punishment. L. Friedman, Crime and Punishment in American History 48 (1993) (hereinafter Friedman) ("From our standpoint, what is most obviously missing, as a punishment [in the colonial system of corrections], is imprisonment"). Colonial jails had a very limited function of housing debtors and holding prisoners who were awaiting trial. See *id.*, at 49. These institutions were generally characterized by "[d]isorder and neglect." McGowen, The Well-Ordered Prison: England, 1780–1865, in The Oxford History of the Prison: The Practice of Punishment in Western Society 79 (N. Morris & D. Rothman eds. 1995) (hereinafter McGowen). It is not therefore surprising that these jails were quite permeable. A debtor could come and go as he pleased, as long as he remained within a certain area (" 'prison bounds' ") and returned to jail to sleep. Friedman 49. Moreover, a prisoner with connections could get food and clothing from the outside, *id.*, at 50; see also W. Lewis, From Newgate to Dannemora: The Rise of the Penitentiary in New York, 1796–1848, p. 49 (1965) (hereinafter Lewis) ("Many visitors brought the felons such items of contraband as rum, tools, money, and unauthorized messages"). In sum, "[t]here was little evidence of authority," McGowen 79, uniformity, and discipline.

Prison as it is known today and its part in the penitentiary system were "basically a nineteenth-century invention."

Friedman 48.   During that time, the prison became the centerpiece of correctional theory, while whipping, a traditional form of punishment in colonial times, fell into disrepute. The industrialization produced rapid growth, population mobility, and large cities with no well-defined community; as a result, public punishments resulting in stigma and shame wielded little power, as such methods were effective only in small closed communities.   *Id.*, at 77.

The rise of the penitentiary and confinement as punishment was accompanied by the debate about the Auburn and Pennsylvania systems, both of which imposed isolation from fellow prisoners and the outside.   D. Rothman, The Discovery of the Asylum 82 (1971) (hereinafter Rothman) ("As both schemes placed maximum emphasis on preventing the prisoners from communicating with anyone else, the point of dispute was whether convicts should work silently in large groups or individually within solitary cells"); *id.*, at 95.   Although there were several justifications for such isolation, they all centered around the belief in the necessity of constructing a special setting for the "deviant" (*i. e.*, criminal), where he would be placed in an environment targeted at rehabilitation, far removed from the corrupting influence of his family and community.   *Id.*, at 71; A. Hirsch, The Rise of the Penitentiary: Prisons and Punishment in Early America 17, 19, 23 (1992); cf. Friedman 77 (describing the changing attitudes toward the origin of crime).   Indeed, every feature of the design of a penitentiary—external appearance, internal arrangement, and daily routine—were aimed at achieving that goal.   Rothman 79–80; see also *id.*, at 83.

Whatever the motives for establishing the penitentiary as the means of combating crime, confinement became standardized in the period between 1780 and 1865.   McGowen 79. Prisons were turned into islands of "undeviating regularity," Lewis 122, with little connection to the outside, McGowen 108.   Inside the prisons, there were only prisoners and jailers; the difference between the two groups was conspicu-

ously obvious. *Id.*, at 79. Prisoners' lives were carefully regulated, including the contacts with the outside. They were permitted virtually no visitors; even their letters were censored. Any contact that might resemble normal sociability among prisoners or with the outside world became a target for controls and prohibitions. *Id.*, at 108.

To the extent that some prisons allowed visitors, it was not for the benefit of those confined, but rather to their detriment. Many prisons offered tours in order to increase revenues. During such tours, visitors could freely stare at prisoners, while prisoners had to obey regulations categorically forbidding them to so much as look at a visitor. Lewis 124. In addition to the general "burden on the convict's spirit" in the form of "the galling knowledge that he was in all his humiliation subject to the frequent gaze of visitors, some of whom might be former friends or neighbors," presence of women visitors made the circumstances "almost unendurable," prompting a prison physician to complain about allowing women in. *Ibid.*

Although by the 1840's some institutions relaxed their rules against correspondence and visitations, the restrictions continued to be severe. For example, Sing Sing allowed convicts to send one letter every six months, provided it was penned by the chaplain and censored by the warden. Each prisoner was permitted to have one visit from his relatives during his sentence, provided it was properly supervised. No reading materials of any kind, except a Bible, were allowed inside. S. Christianson, With Liberty for Some: 500 Years of Imprisonment in America 145 (1998). With such stringent regimentation of prisoners' lives, the prison "had assumed an unmistakable appearance," McGowen 79, one which did not envision any entitlement to visitation.

Although any State is free to alter its definition of incarceration to include the retention of constitutional rights previously enjoyed, it appears that Michigan sentenced

respondents against the backdrop of this conception of imprisonment.

## II

In my view, for the reasons given in *Hudson* v. *McMillian*, 503 U. S. 1, 18–19 (1992) (THOMAS, J., dissenting), regulations pertaining to visitations are not punishment within the meaning of the Eighth Amendment. Consequently, respondents' Eighth Amendment challenge must fail.