Graham v. Corrections                CV-02-377-PB  1/12/05

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE

**Melvin Graham**

    **v.**                                                Civil No. CV-02-377-PB

                                            Opinion No.  2005 DNH 006

**Bruce Cattell, et al.**

## MEMORANDUM AND ORDER

Melvin Graham is currently incarcerated at the Northern New Hampshire Correctional Facility ("NCF") in Berlin, New Hampshire. He brings this lawsuit against the facility's librarian, Angela Rouleau Poulin,[1] as well as her supervisors: Warden Bruce Cattell and former New Hampshire Department of Corrections Commissioner Phil Stanley. Graham seeks relief under 42 U.S.C. § 1983 for two separate First Amendment violations. First, he claims that library regulations, policies and practices[2] developed by Poulin

---

[1] Poulin married after Graham filed his claim and has since changed her name. At the time of filing, her name was Angela Rouleau. For the purposes of this order, I shall refer to defendant as "Poulin."

[2] For the purposes of this order, a "regulation" is a formally enacted rule memorialized in a policy and procedure directive ("PPD"). A "policy" is also a rule, yet unlike a

violate his First Amendment right to access the courts.  Second, he claims that defendants implemented some of the policies and practices to retaliate against him for exercising his First Amendment rights.  I conclude that no reasonable jury could agree with either of Graham's arguments.  I therefore grant defendants' summary judgment motion on both claims.

## I.  BACKGROUND

Graham resides in the prison complex at NCF.  This case initially arose from an incident that occurred there in December 2001.  Over the course of a weekend, Graham suffered serious physical symptoms after he was bitten by a spider.  In August 2002, he filed suit against certain state officials claiming that their deliberate indifference to his condition caused his injuries to worsen in violation of his Eighth Amendment right against cruel and unusual punishment.[3]  In the same complaint,

---

regulation, is not memorialized in a PPD.  A "practice" is either an official action or series of actions, as distinct from a rule, that may affect the prison population generally.

[3] Graham's Eighth Amendment claim was dismissed without prejudice for failure to exhaust administrative remedies pursuant to the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a).  (Doc. No. 58).  His motion to reconsider was denied.  (Doc. No. 62).

Graham also raised grievances about the following five regulations, policies and practices affecting his use of NCF's library facilities: (1) the prison's library scheduling regulations and policies; (2) the quality of its research materials; (3) the "no talking" policy; (4) the quality of library furniture; and (5) its photocopying policy. Poulin implemented these regulations, policies and practices as part of her responsibilities as NCF's librarian. I discuss each of Graham's claims in detail below.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A trial is only necessary if there is a genuine factual issue "that properly can be resolved only by a finder of fact because [it] may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986). A material fact is one that affects the outcome of the

-3-

suit.  See id. at 248.

In ruling on a motion for summary judgment, I must construe the evidence in the light most favorable to the non-movant.  See Navarro v. Pfizer Corp., 261 F.3d 90, 94 (1st Cir. 2001).  The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has properly supported its motion, the burden shifts to the non-moving party to "produce evidence on which a reasonable finder of fact, under the appropriate proof burden, could base a verdict for it; if that party cannot produce such evidence, the motion must be granted."  Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 94 (1st Cir. 1996) (citation omitted).  Neither conclusory allegations, improbable inferences, nor unsupported speculation are sufficient to defeat summary judgment.  See Carroll v. Xerox Corp., 294 F.3d 231, 236-37 (1st Cir. 2002).

## III. **DISCUSSION**

### A. **First Amendment Right of Access to the Court**

Graham argues that each of the challenged regulations, policies and practices impede his access to the courts. He correctly asserts that it is "undisputed that inmates have a fundamental constitutional right of access to the courts." Carter v. Fair, 786 F.2d 433, 435 (1st Cir. 1986) (citing Bounds v. Smith, 430 U.S. 817, 828 (1977)). This right of access, however, requires only that prison authorities "assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." Bounds, 430 U.S. at 828. To make a claim that access to the courts has been denied, then, an inmate must show "that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Lewis v. Casey, 518 U.S. 343, 351 (1996).

It is important to note that because the touchstone is meaningful access to the courts, "prison law libraries and legal assistance programs are not ends in themselves, but only the means for ensuring 'a reasonably adequate opportunity to present

-5-

claimed violations of fundamental constitutional rights to the courts.'" Lewis, 518 U.S. at 351 (quoting Bounds, 430 U.S. at 825). "Because Bounds did not create an abstract, freestanding right to a law library or legal assistance, an inmate cannot establish relevant actual injury simply by establishing that his prison's law library or legal assistance program is subpar in some theoretical sense." Id. Therefore, in order for Graham to assert a violation, he must "demonstrate that a nonfrivolous legal claim ha[s] been frustrated or was being impeded" by the policies and practices of the prison authorities. Lewis 518 U.S. at 353; see also Christopher v. Harbury, 536 U.S. 403, 413-15 (2002) (holding that the right of access is "ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court").

Even if a prison regulation, policy or practice hinders a prisoner's ability to access the courts, it may be upheld if what is challenged bears a rational relationship to legitimate penological interests. See Overton v. Bazzetta, 539 U.S. 126, 132 (2003); Lewis, 518 U.S. at 361; Savard v. Rhode Island, 338 F.3d 23, 30-31 (1st Cir. 2003). Four factors are relevant to this analysis: (1) "whether the regulation has a 'valid rational

connection' to a governmental interest"; (2) "whether alternative means are open to inmates to exercise the asserted right"; (3) "what impact an accommodation of the right would have on guards and inmates and prison resources"; and (4) "whether there are 'ready alternatives' to the regulation." Overton, 539 U.S. at 132, quoting Turner v. Safety, 482 U.S. 78, 89-91 (1987).

## 1. Library Scheduling

Graham's first grievance is that prison regulations and policies do not provide him with sufficient time to conduct research. Under NCF regulations, prisoners are allotted a total of four hours of library time per week, but may apply for extended time if he can present Poulin with proof that he is engaged in active litigation. See Plaintiff's Exhibit B, N.H. Department of Corrections Policy and Procedure Directive, 7.20 (IV) (A) (3-4) (effective date: 11/01/03) ("Exhibit B").

Prison policy further limits access to the law library to two separate time blocks: from 6:45am to 10:45am and from 10:45am to 2:30pm. Poulin Aff. at 2. This policy, and the regulations regarding weekly allocation of library time, have been in effect throughout Poulin's tenure at NCF. See Plaintiff's Exhibit A,

Affidavit of Angela Rouleau Poulin at 2 ("Poulin Aff.").[4]

Graham claims that additional policies were adopted after he filed an action in Coos County Superior Court challenging the time limitations placed on library use at NCF. See Am. Compl. (Doc. No. 12) at 3.[5] When prison officials agreed to allow Graham eight hours of access to the law library per week, the court dismissed the writ as moot. Id.

Under the new policies, if a prisoner signs up for time in the law library, he must report to the library and sign in. See

---

[4] Graham observes that these and other policies became effective on 11/01/03. See Plaintiff's Objection to Defendant's Motion for Summary Judgment (Doc. No. 72) at 4. He then notes that NCF has been operational since April 2000. Id. Graham believes that this implies that the policies at issue must have changed. However, without access to the policies they replaced, there is no way to know whether this is true or not. The only facts presented on this issue are statements made by Poulin. Those statements, uncontradicted by evidence to the contrary, proclaim that the rules at issue have remained unchanged.

[5] Graham claims that he has filed three separate habeas petitions in the New Hampshire Superior Court, one in the New Hampshire Supreme Court, and one here in U.S. District Court. See Plaintiff's Objections to Summary Judgment (Doc. No. 72) at 7. Graham has not produced any additional information about these actions. Id. He claims only that the petitions were denied on procedural grounds and that a different result might have occurred were library conditions as he claims they should be. Id. Without more information, I have no way to evaluate these claims.

Am. Compl. at 4. If he signs up for a morning slot, he must arrive on time, and he may leave for breakfast only after signing in. See Poulin Aff. at 3. If a prisoner is late or fails to keep his appointment, the prisoner may be subject to disciplinary action. This may effect his parole status. Graham has not alleged that he has been disciplined in any way for his failure to comply. He does argue, however, that he suffers from hearing loss and therefore must rely on prison officials to wake him up in the morning. See Am. Comp. at 4. If they fail to do so and he is late, he may be punished. Id. This, he claims, makes it highly likely that he will be disciplined in the future.

In evaluating the reasonableness of the scheduling policy, it is important to note that "the Constitution does not guarantee a prisoner unlimited access to a law library. Prison officials of necessity must regulate the time, manner, and place in which library facilities are used." Lindquist v. Idaho State Bd. of Corr., 776 F.2d 851, 858 (9th Cir. 1985). Here, Poulin has done exactly that.

A policy limiting inmates to four hours of law library-use per week, but providing for the possibility that this time may be extended, is clearly permissible as a regulation reasonably

related to the stated, and in my view, legitimate, penological interest of maintaining prison order.  Poulin Aff. at 3.  So too is the requirement that prisoners arrive on time to sign in.  Without these polices, it could prove difficult to keep track of a prisoner's whereabouts and to ensure that all prisoners are given comparable access to library resources.  Supported rationally by reasonable policy concerns, then, these regulations do not violate Graham's First Amendment right of access to the courts.

## 2.   Research Materials

Graham's second grievance is that the prison's newly established computer research system impedes his ability to effectively research his claims.  Among other resources, the NCF law library has acquired several LOIS-law computer research terminals.  Poulin Aff. at 3.  These terminals replaced the library's book-based research system, which the New Hampshire Department of Corrections decided was too costly to maintain.  Id.  The new system provides access to a wide range of materials, including case law and statutes.[6]  Id.  Prisoners who do not know

---

[6]  The LOIS-law databases include the New Hampshire Rules of Evidence, Practice, and Procedure, New Hampshire statutes,

how to use NCF's computers may learn to do so by reading instruction books, or by referencing a help application within the LOIS program.  Outdated case reporters and treatises are maintained in the recreation library for those who are unable or unwilling to learn how to use the computers.  See Am. Compl. at 4.  If an inmate is unable to find what he needs, he may fill out a request form which Poulin can then pass on to the main prison library, the prison's in-house counsel, or even the New Hampshire Supreme court library, to be answered.

When evaluating whether these resources meet constitutional standards, it is important to recognize that "the Prison need not provide its inmates with a library that results in the best possible access to the courts."  Lindquist, 776 F.2d at 856. Given the library resources available to Graham, it is thus difficult to see how he can credibly claim that he is denied at least adequate access.  According to Lewis, "the Constitution does not require that prisoners (literate or illiterate) be able to conduct generalized research, but only that they be able to

---

federal circuit court opinions, U.S. Supreme Court opinions, Federal Rules of Civil and Appellate Procedure, and local rules of procedure.

-11-

present their grievances to the courts -- a more limited capability that can be produced by a much more limited degree of legal assistance."  518 U.S. at 360.  Graham's ability to bring this suit and pursue it to the summary judgment stage is evidence, in and of itself of his ability to gain meaningful access to the courts.  I thus hold that NCF's research facilities do not violate Graham's First Amendment right of access to the courts.

### 3.    The "No Talking Policy"

Graham's third grievance is that NCF has adopted a strict "no-talking" policy between inmates while in the law library.  He views this limitation as an additional impediment to his right of access.

Under prison regulations, only individual research is permitted.  See Exhibit B, (IV) (C) (2) (a).  The purpose of this rule is to ensure that library time is used effectively by attending prisoners and to maintain order and discipline.  Poulin Aff. at 3.  Poulin has interpreted this regulation to restrict any talk in the library, whatsoever.  Id. at 2.  Like the other policies Graham criticizes, the "no talking" policy has been in effect throughout Poulin's tenure.  Id.

Graham argues that the deficiency in library resources could be overcome were prisoners allowed to confer. For this reason he asks me to strike the policy down. I refuse to do so. As noted, prison officials may reasonably regulate the manner in which library facilities are used. Lindquist, 776 F.2d at 858. The "no talking" policy is a reasonable "manner restriction." Its penological purpose is to maintain order and discipline in the library. Poulin Aff. at 3. Without these rules, it would be more difficult for Poulin and others to ensure that library time is being used properly. Graham does not present any evidence to suggest that such an approach is otherwise unreasonable. Without such evidence, I must rule in defendant's favor. See Ayala-Gerena, 95 F.3d at 94 (requiring the party opposing a motion for summary judgment to come forward with some evidence to prove the existence of a material fact after its existence has been called into question by the moving party). I hold that the policy of requiring prisoners to conduct legal research on their own does not violate Graham's First Amendment right of access to the courts.

4. **Uncomfortable Chairs**

Graham's fourth grievance is that the law library chairs

make it physically uncomfortable for him to do research there. The prison replaced more comfortable chairs with the current chairs only after Graham filed his initial complaint. This occurred when it was discovered that the older chairs were housed in the law library as the result of an administrative error. See Poulin Aff. at 4. When the error was discovered, the chairs were promptly returned to the state. Id. They were replaced by chairs no different from those used throughout the NCF facility. Id.

Again, Graham's claim that replacing the comfortable chairs violates his access rights is contradicted by the very fact that Graham has brought this case to the summary judgment stage of litigation. To obtain relief against the state for impeding access to the court, one must show that a claim has been frustrated as a result of the alleged impediment. See Lewis, 518 U.S. at 353. Nowhere has Graham alleged that prison chairs have resulted in injury to this or any case that he has filed. They thus do not inhibit his ability to access the courts.

5. **Photocopy Policy**

Graham's final complaint is that prison policy requires Poulin to make copies of court material used by litigating

-14-

prisoners.[7]  This policy, Graham asserts, allows Poulin to

impermissibly read and review the legal documents submitted by

prisoners for photocopying.  He seems to base his claim first on

an assertion of certain privacy rights and second on the fact

that invading these rights may deter future filings.  Poulin

states that, as a practice, she only examines the contents of

these materials if, on their face, they contain information that

threatens prison security.[8]  See Poulin Aff. at 4.  Otherwise,

she examines prisoner documents in a cursory fashion and only in

order to remove staples or crumpled paper prior to making copies.

Stapled or crumpled paper, she states, damage the library's

copier.  Id.

I reject Graham's challenge to the photocopying policy for

two reasons.  First, his claim fails because he has not offered

---

[7]  Regulations regarding photocopying services are
enumerated in a PPD.  See Defendant's Exhibit D, N.H. Department
of Corrections Policy and Procedure Directive, 7.42 ("Exhibit
D").  Exhibit D does not contain any explicit language requiring
the librarian to make photocopies.  Nor does Exhibit D govern the
care a librarian must take to examine, or, for that matter, not
examine, documents while copies are made.  I therefore treat what
is challenged as a prison policy.

[8]  This would occur if, for instance, materials detailed a
concerted plan designed by prisoners to attempt an escape.

evidence that the policy compromised his ability to litigate a specific claim. As I have explained, such evidence is required to establish an access to the courts claim. <u>See e.g.</u>, <u>Lewis v. Casey</u>, 518 U.S. 343, 351 (1966). Second, because the policy is rationally related to legitimate penological interests, Graham's challenge fails even if he could prove that the policy hindered his ability to litigate a specific claim. Defendants have a legitimate interest in ensuring that documents that are submitted for photocopying do not contain staples, crumpled pages, tape or other defects that could damage the photocopier. They also have a strong interest in ensuring that the photocopier is not misused in ways that could compromise prison security or adversely impact public safety. Further, the cursory review of submitted documents that the policy ordinarily permits Poulin to make is among the least intrusive alternatives open to defendants. Thus, because none of the other factors identified in <u>Overton</u> favor Graham's position, his challenge to the policy would fail even if he could demonstrate that he was adversely affected by the policy in a specific case.

B.    **First Amendment Right Against Retaliation**

Graham next argues that Poulin has attempted to retaliate

against him for exercising his right to redress grievances through litigation. Graham cites three separate prison actions in support of this argument. The first is the modification to the library scheduling policy, which now requires inmates to arrive at the law library on time to sign in. The second is Poulin's decision to remove those chairs from the law library that Graham considered "comfortable" and to replace those chairs with less comfortable chairs. The third is Poulin's decision to more strictly enforce the prison's "no talking" policy.[9]

To prove that Poulin violated his right against retalation, Graham must show: (1) that he had a First Amendment right; (2) that Poulin took an adverse action against him; (3) with the intent to retaliate against him for exercising that right; and (4) that the retaliatory act caused the injury for which he is seeking compensation. See McDonald v. Steward, 132 F.3d 225, 231 (5th Cir. 1998).

Graham has met the first element of the test. The First Circuit Court of Appeals recognizes an inmate's First Amendment

---

[9] Graham registers particular concern over a warning issued to all prisoners in September 2003 not to engage in conversation while in the law library. See Plaintiff's Exhibit A, Verbatim Copy of Notice on Law Clerks Desk at NCF Law Library.

right of access to the courts and will redress any actions by prison officials that punish an inmate for exercising this right. See Ferranti v. Moran, 618 F.2d 888, 891-92 (1st Cir. 1980).

Graham has failed, however, to meet the second element. Each action cited by Graham is a shift in prison operations that affects the prison population generally. No cited action targets Graham alone. Without some proof, beyond pure allegation, that these actions were taken by Poulin in an effort to punish Graham, he fails to meet the requirements of the second element.

Graham, has also failed to offer any proof that the cited actions were taken with retaliatory intent. With respect to the sign-in and "no talking" policies, he is unable to contradict Poulin's assertion that they were enacted to maintain a greater measure of order among prisoners who use the law library. With respect to the change in prison furniture, Graham is unable to contradict Poulin's assertion that comfortable chairs were removed because they were placed at NCF as a result of administrative error and needed to be returned. If these reasons are purely pretext, Graham has failed to provide proof as to why or how. Instead, he relies on conclusory assertions that they were animated by retaliatory motives alone. Especially when

challenging actions that affect the prison population generally, more is required to survive summary judgment.  Defendant's motion with respect to these claims is therefore granted.[10]

## IV.  CONCLUSION

Defendants' motion for summary judgment (Doc. No. 65) is granted in its entirety.  The clerk is instructed to enter judgment accordingly.

SO ORDERED.

_____
Paul Barbadoro
United States District Judge

January 12, 2005

cc:  Melvin Graham
     Daniel Mullen, Esq.

---

[10]  Graham's supervisory liability claims fail because he cannot establish that any of the supervisees violated his constitutional rights.  See Febus-Rodriquez v. Betancourt-Lebron, 14 F.3d 87, 92 (1st Cir. 1994)