**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

RAY HRDLICKA, an individual;
CRIME, JUSTICE & AMERICA, INC., a
California corporation,
            *Plaintiffs-Appellants,*

            v.

PERRY L. RENIFF, in his official
capacity of Sheriff of the County
of Butte, California,
            *Defendant-Appellee.*

No. 09-15768

D.C. No.
2:08-cv-00343-
GEB-EFB

RAY HRDLICKA, an individual;
CRIME, JUSTICE & AMERICA, INC., a
California corporation,
            *Plaintiffs-Appellants,*

            v.

JOHN MCGINNESS, Sacramento
County Sheriff,
            *Defendant-Appellee.*

No. 09-16956

D.C. No.
2:08-cv-00394-
FCD-EFB

ORDER

Filed September 1, 2011

Before: Stephen Reinhardt, William A. Fletcher and
N. Randy Smith, Circuit Judges.

Order;
Concurrence by Judge Reinhardt
and Judge William A. Fletcher;
Dissent by Judge O'Scannlain

16629

## ORDER

Judge Reinhardt and Judge W. Fletcher have voted to deny the Appellees' petitions for rehearing and petitions for rehearing en banc, filed on February 15, 2011 and February 23, 2011. Judge N.R. Smith voted to grant both.

A judge of the court called for a vote on the petitions for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R. App. P. 35(f).

The petitions for rehearing and the petitions for rehearing en banc are **DENIED**.

---

REINHARDT and W. FLETCHER, Circuit Judges, concurring in the denial of rehearing en banc:

The question presented in this case is straightforward: Does the four-factor test of *Turner v. Safley*, 482 U.S. 78 (1987), apply to distribution of a magazine to county jail inmates who have not requested it? A majority of the three-judge panel concluded that *Turner* does apply. An en banc call failed to receive a majority vote of the active judges of our court.

The *Turner* test evaluates the reasonableness of a prison regulation impinging on a constitutional right. We have applied *Turner* in a number of cases to evaluate the reasonableness of regulations banning the distribution of mail. In *Crofton v. Roe*, 170 F.3d 957 (9th Cir. 1990), we applied *Turner* to evaluate a regulation prohibiting an inmate from receiving a gift book from his stepfather. In *Prison Legal News v. Cook*, 238 F.3d 1145 (9th Cir. 2001), we applied *Turner* to evaluate a regulation banning distribution of bulk-rate mail to which prisoners had subscribed. In *Morrison v. Hall*, 261 F.3d 896 (9th Cir. 2001), we applied *Turner* to evaluate

a regulation banning distribution of "pre-paid, for-profit, subscription publications." In *Prison Legal News v. Lehman*, 397 F.3d 692 (9th Cir. 2005), we applied *Turner* to evaluate a regulation banning distribution of requested but "non-subscription bulk mail."

We concluded that the *Turner* test applies, as well, to evaluate the reasonableness of regulations banning distribution of an unsolicited magazine, Crime, Justice & America ("CJA"). CJA is of unquestioned value to county jail inmates. Because inmates are typically in county jail for relatively short periods, and because the value of CJA to inmates is greatest when they first arrive in the jail, it is unrealistic to insist, as a condition for applying the *Turner* test, that inmates have already subscribed to CJA.

We wrote in our opinion, "The fact that in this case the publication was unsolicited may, of course, be taken into account in applying the *Turner* test. But the fact that the publication was unsolicited does not make the *Turner* test inapplicable." *Hrdlicka v. Reniff*, 631 F.3d 1044, 1051 (9th Cir. 2011).

---

O'SCANNLAIN, Circuit Judge, joined by GOULD, TALLMAN, BYBEE, CALLAHAN, BEA, IKUTA and N.R. SMITH Circuit Judges, dissenting from the denial of rehearing en banc:

The court today holds that the First Amendment mandates that county jails distribute unsolicited junk mail to their inmates, or face a burdensome lawsuit from the junk mail publisher, citing *Turner v. Safley*, 482 U.S. 78 (1987).[1] Given

---

[1]The majority speaks only of the rights of publishers. But because "newsmen have no constitutional right of access to prisons or their inmates beyond that afforded the general public," any rule that applies to the publishers would apply equally to anyone else. *Pell v. Procunier*, 417 U.S. 817, 834 (1974); *see also Houchins v. KQED, Inc.*, 438 U.S. 1, 11-12 (1978).

that *Turner* decided only the standard of review to apply when a prison regulation impinges upon *inmates'* First Amendment rights, *id.* at 89, the majority's interpretation is an extraordinary leap since all agree that no inmate rights are at stake in this case. Regrettably, the majority's opinion is completely untethered from Supreme Court precedent and in considerable tension with our own case law. It further complicates the already "inordinately difficult undertaking" of prison administration. *Id.* at 85. I respectfully dissent, therefore, from the failure of our court to rehear this case en banc.

I

Ray Hrdlicka publishes a quarterly magazine called *Crime, Justice & America* ("CJA") that includes a number of items which may be of interest to jail inmates. Indeed, between 2002 and the publication of the majority's opinion, CJA went through fourteen editions totaling over one million copies. Which is quite impressive, until one realizes that rather than relying on subscriptions, CJA has simply blanketed jailhouses with hundreds of free copies every week.[2]

CJA's business model is fairly simple. It lures advertisers —usually bail bondsmen and lawyers—with the promise of a captive audience of thousands of inmates in immediate need of their services. It then ensures that it will fulfill that promise by pressuring jail administrators to choose either leaving stacks of CJA in common areas or allowing individual copies of CJA to be mailed directly to inmates off of an inmate roster. Either way, every seven days enough copies arrive at the targeted jails to ensure that at least one out of every ten inmates gets one. Hrdlicka is thereby able to externalize the cost of increasing his readership on the prison system.

---

[2]Though CJA is a quarterly magazine, it is distributed on a weekly basis so that even with the rapid turnover in county jails copies will be available to current inmates. *See Distribution of Crime Justice & America Magazine*, Crime Justice & America, (Feb. 27, 2011) http://crimejusticeand-america.com/distribution-of-crime-justice-america-magazine.

Pursuant to content neutral department policies, officials at the Sacramento County and Butte County Jails refused to facilitate Hrdlicka's distribution scheme while allowing Hrdlicka to send CJA to any prisoner who requested it. But in an effort to minimize the risk of smuggled contraband as well as the amount of excess paper inmates could use to do things like start fires or clog toilets, these jail administrators refused to disseminate extra copies to those inmates who had not asked for them.

Hrdlicka filed a suit under 42 U.S.C. § 1983 claiming a constitutional right to pursue his business model. And now this court obliges by discovering such a right in the First Amendment.

## II

Challenges to jail or prison regulations limiting outside contact with prisoners undoubtedly involve the balancing of constitutional imperatives. *Turner*, 482 U.S. at 84. The majority focuses almost entirely upon those implicated by the First Amendment. But also among them is that running a jail "requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government." *Id.* at 84-85. Therefore the separation of powers "counsel[s] a policy of judicial restraint," particularly "[w]here a state penal system is involved." *Id.*; *see also Beard v. Banks*, 548 U.S. 521, 528 (2006).

Fundamental to maintaining this balance between a prisoner's right to contact with the outside world and the State's ability to run a functional prison system is the ability to recognize when First Amendment interests are implicated. And regardless of what the majority may have found in the pages of CJA, nothing in the United States Reports or the Federal Reporter gives an outsider a First Amendment interest, let alone a freestanding right, to unsolicited contact with inmates.

The Supreme Court has certainly never found such an interest. *See Jones v. N.C. Prisoner's Labor Union, Inc.*, 433 U.S. 119, 121 (1977) (brushing aside a union challenge to a restriction against bulk mail to inmates, as "barely implicat[ing]" First Amendment rights); *Pell v. Procunier*, 417 U.S. 817, 822 (1974) (allowing a prohibition on face-to-face interviews with inmates based on "the familiar proposition that lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights" (internal quotation marks omitted)).

Indeed, the only time the Court has ever acknowledged a publisher's "interest in access to prisoners" is when those prisoners "through subscription, willingly seek their point of view." *Thornburgh v. Abbott*, 490 U.S. 401, 408 (1989). Only then—when jail regulations limit a detainee's access to the outside world—has the Court considered the First Amendment interests of the person with whom the detainee wished to correspond. And, even then, the Court made clear that it was announcing a rule for when the "rights of prisoners *and* outsiders" are at issue. *Id.* at 410 n.9. *Cf. Shaw v. Murphy*, 532 U.S. 223, 229-30 (2001) (stating that *Turner* "adopted a unitary, deferential standard for reviewing *prisoners'* constitutional claims" (emphasis added)).

Until now, we have scrupulously followed the Supreme Court's direction and recognized the derivative nature of publishers' First Amendment interests in contacting prisoners. *See Prison Legal News v. Lehman (PLN II)*, 397 F.3d 692, 701 (9th Cir. 2005) (describing *Jones* as upholding "a ban on junk mail" and distinguishing a "scenario in which a publisher has [not] attempted to flood a facility with publications sent to all inmates, regardless of whether they requested the publication"); *Morrison v. Hall*, 261 F.3d 896, 898 (9th Cir. 2001) ("Moreover, prisons can and have adopted policies permitting prisoners to receive for-profit, commercial publications, while at the same time, prohibiting prisoners from receiving unso-

licited junk mail."); *see also Prison Legal News v. Cook (PLN I)*, 238 F.3d 1145, 1146 (9th Cir. 2001).

But the majority puts all of this precedent aside, and declares that "[a] First Amendment interest in distributing and receiving information does not depend on a recipient's prior request for that information." *Hrdlicka v. Reniff*, 631 F.3d 1044, 1049 (9th Cir. 2011).

The majority tries to conceal such ipse dixit with a passing citation to two cases standing for the unremarkable proposition that laws criminalizing core protected speech in traditional public fora are subject to strict scrutiny. *See Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) (prohibition against summoning residents to their front doors for the purposes of distributing literature); *Klein v. City of San Clemente*, 584 F.3d 1196, 1204-05 (9th Cir. 2009) (leafleting unoccupied vehicles on city streets). These cases are utterly irrelevant to whether Hrdlicka's First Amendment interests were implicated by the prison restrictions at issue in this case at all.

III

Even if the majority were correct that Hrdlicka had a First Amendment interest at stake, it still erred by applying the factors annunciated in *Turner* without taking context into account. *Cf. Thornburgh*, 490 U.S. at 414 (stating that the *Turner* factors were designed to "channel[ ] the reasonableness inquiry"). For example, what does it mean to consider "whether there are alternative avenues that remain open to the inmates to exercise the right" or "the impact that accommodating the asserted right will have on other guards and prisoners" when no one contends that an inmate's rights are at risk? *PLN II*, 397 F.3d at 699 (internal quotation marks omitted). The majority inexplicably provides special rights to Hrdlicka because he was attempting to communicate with someone who has been incarcerated.

First, a jail cell is quite clearly not a public forum. *See Jones,* 433 U.S. at 134 (holding that a "prison may be no more easily converted into a public forum than a military base"); *accord Adderley v. Florida*, 385 U.S. 39, 41 (1966); *United States v. Douglass*, 579 F.2d 545, 549 (9th Cir. 1978).[3] As such, under ordinary rules, government officials could have excluded Hrdlicka's speech on the basis of its subject matter or even his identity " 'so long as the distinctions drawn [were] *reasonable* in light of the purpose served by the forum and [were] viewpoint neutral.' " *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98, 131 (2001) (emphasis added). "The First Amendment does not demand unrestricted access to a nonpublic forum merely because use of that forum may be the most efficient means of delivering the speaker's message." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 809 (1985).

Second, rather than criminalizing speech, the ban on unsolicited copies of CJA merely served to preserve the public fisc.[4] And the Court has made abundantly clear that the elected branches may set spending priorities in ways that negatively and unequally impact free speech rights so long as they do not discriminate on the basis of viewpoint. *See Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588 (1988) (citing *Maher v. Roe*, 432 U.S. 464, 475 (1977) ("There is a basic difference between direct state interference with a protected activity and state encouragement of an alternative activity consonant with legislative policy.")).

---

[3]Indeed, the majority does not even dispute that jails are not public fora. *See Hrdlicka*, 631 F.3d at 1050.

[4]Recall that every piece of mail that enters a detention facility must be inspected, sorted, distributed, monitored and ultimately disposed of. *Cf. Shaw*, 532 U.S. at 231 (allowing jails to consider such burdens even in letters involving legal advice). Restrictions on junk mail allow jail administrators better to allocate resources to other legitimate, and more pressing concerns.

In sum, assuming Hrdlicka has an independent First Amendment interest involved in this case, that interest does not extend to commandeering public facilities for his personal gain. And it is not infringed by a "viewpoint-neutral exclusion of speakers who would disrupt [these] nonpublic for[a] and hinder [their] effectiveness for [their] intended purpose." *Cornelius*, 473 U.S. at 811. Under such circumstances, the burden was on *him* to show that the regulations were not supported by any rational basis. *See, e.g.*, *Regan v. Taxation with Representation*, 461 U.S. 540, 547-51 (1983).

IV

Instead, the majority places on jail administrators the onerous burden of showing "the degree to which the[ ] purposes [behind the regulations] are actually served by a refusal to allow" distribution of any particular type of unsolicited junk mail. *Hrdlicka*, 631 F.3d at 1051.[5] Indeed, *Beard v. Banks*, 548 U.S. 521 (2006), specifically held to the contrary, even under *Turner's* standard, a regulation preventing certain inmates from receiving *any* magazines based upon a statement and a deposition that these restrictions motivated better behavior. *See also Overton v. Bazzetta*, 539 U.S. 126, 132 (2003) (stating that when a prison regulation is being challenged, "[t]he burden is not on the State to prove its validity, but on the prisoner to disprove it.").

Then, in a wonderful display of why federal judges should not be running jails, the majority dismisses out of hand many

---

[5]In particular, the majority expects jails to prove "the degree to which allowing [the] distribution [of any particular piece of mail] in the jails would produce additional clutter in inmates cells or otherwise adversely affect jail security," *Hrdlicka*, 631 F.3d at 1052 and "to what degree[ ] the jails would be forced to expend additional resources" to handle the additional correspondence." *Id.* at 1054.

practical concerns that will arise from requiring jails to distribute an unknown quantity of unsolicited mail.[6]

The majority also simply ignores the impact its ruling produces beyond these jails and this publication. As Judge Smith's dissent correctly points out, one consequence of the majority's decision is to "force[ ] sheriffs either to allow all unrequested mail to reach inmates or to make a case by case determination of the quality of the publication." *Hrdlicka*, 631 F.3d at 1057 (N.R. Smith, J., dissenting). Sheriffs should not be put in this predicament. Instead, courts should give "considerable deference to the determinations of prison administrators who, in the interest of security, regulate the relations between prisoners and the outside world." *Thornburgh*, 490 U.S. at 408. In applying such deference, we as federal judges must allow prison officials to "reach[ ] experience-based conclusion[s]" about which "policies help to further legitimate prison objectives." *Beard*, 548 U.S. at 533.

V

The First Amendment does not give publishers any interest (to say nothing of a right) to send unsolicited mail to inmates. Sending such mail may be highly profitable to the publisher, but "losing [such] cost advantages does not fundamentally implicate free speech values." *Jones*, 433 U.S. at 130-31. By failing to recognize this, the majority ignores the separation of powers and unnecessarily injects the federal courts into a matter "peculiarly within the province of the legislative and executive branches of government." *Turner*, 428 U.S. at 84-85. And by the full court's failure to order rehearing en

---

[6]For this among other reasons, I also disagree with the manner in which the majority applied the four-part test in *Turner*. *See Shaw*, 532 U.S. at 239 (requiring only that the connection between the restriction and the purpose behind not be arbitrary or irrational). But such concerns are secondary to the simple fact that the majority should not have applied *Turner* at all.

banc, we have needlessly muddled our First Amendment jurisprudence. I respectfully dissent from our regrettable decision not to rehear this case en banc.