******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* JOSEPH LOUIS IMPERIALE
### (SC 20391)

Robinson, C. J., and Palmer, McDonald, D'Auria,
Mullins, Kahn and Ecker, Js.*

*Syllabus*

The defendant, who had been on probation after his conviction of possession of child pornography in the second degree, appealed from the trial court's judgment revoking his probation. In connection with the defendant's child pornography conviction, the sentencing court had imposed a term of imprisonment followed by a period of probation with conditions, including sex offender treatment. After being released from prison, the defendant entered an inpatient sex offender treatment facility for treatment. Before completing his course of treatment there, however, he was discharged on the basis of his failure to adhere to various conditions established by the facility for continued placement there. The defendant subsequently was charged with violating his probation as a result of his failure to complete sex offender treatment. The defendant filed a motion to dismiss the violation of probation charge, contending, inter alia, that the probationary condition requiring him to successfully complete the sex offender treatment program violated his due process rights. The trial court denied the motion and found the defendant to be in violation of his probation. On appeal from the trial court's judgment revoking the defendant's probation, *held* that the trial court properly denied the defendant's motion to dismiss the violation of probation charge: the defendant's claim that his placement at the treatment facility violated his right to due process on the ground that it was the functional equivalent of incarceration was unavailing, as the restrictions imposed on persons receiving treatment at the facility were appreciably less onerous than those placed on prison inmates, and, thus, residency at the facility was materially different from confinement in a prison; moreover, the defendant's placement at the facility furthered the rehabilitative and public safety purposes of probation, and, because the defendant's probation officer reasonably concluded that the defendant's placement at the facility was the best, most appropriate option under the circumstances, that probationary condition did not offend principles of due process; furthermore, there was no merit to the defendant's claim that subjecting him to the highly restrictive conditions at the facility violated his right to equal protection on the ground that he was placed there due to his status as a homeless person upon his release from prison, as that claim foundered on the trial court's factual finding that he was not referred to the facility because he was homeless, and the defendant's claim that requiring him to attend the sex offender treatment program at the facility as a condition of probation violated his eighth amendment right to be free from cruel and unusual punishment also failed when, as in the present case, the condition of probation was reasonably necessary to accomplish the legitimate goals of probation.

Argued January 23, 2020—officially released January 7, 2021**

*Procedural History*

Information charging the defendant with violation of probation, brought to the Superior Court in the judicial district of Litchfield, where the court, *Danaher, J.*, denied the defendant's motion to dismiss and rendered judgment revoking the defendant's probation, from which the defendant appealed. *Affirmed.*

*James B. Streeto*, senior assistant public defender, for the appellant (defendant).

*Matthew A. Weiner*, assistant state's attorney, with

whom, on the brief, were *David S. Shepack*, former state's attorney, *David R. Shannon*, supervisory assistant state's attorney, and *Gregory L. Borrelli*, assistant state's attorney, for the appellee (state).

*Opinion*

PALMER, J. The defendant, Joseph Louis Imperiale, appeals from the judgment of the trial court, *Danaher*, *J.*, revoking his probation and sentencing him to an effective term of imprisonment of two years. He claims that the trial court improperly denied his motion to dismiss the violation of probation charge because the condition of probation on which the charge was predicated, namely, that he participate in an inpatient sex offender treatment program, violated his fourteenth amendment rights to due process and equal protection, as well as the constitutional prohibition against the imposition of cruel and unusual punishment. We disagree and, accordingly, affirm the judgment of the trial court.

The following undisputed facts and procedural history are relevant to our resolution of this appeal. On January 4, 2013, the defendant pleaded guilty to illegal possession of child pornography in the second degree, in violation of General Statutes § 53a-196e.[1] At the time of the guilty plea, the assistant state's attorney informed the trial court, *Ginocchio*, *J.*, that, following a police investigation into the trafficking of child pornography, the defendant had confessed to the possession of numerous images on his personal computer depicting young children involved in various sex acts. Before accepting the defendant's plea, the court explained to the defendant that he was waiving certain constitutional rights by pleading guilty, and the defendant stated that he understood he was doing so. The court also explained to the defendant that, under the plea agreement, he would be sentenced to a term of imprisonment of ten years, suspended after four years, followed by ten years of probation, the conditions of which would include sex offender registration and "most likely . . . sex offender evaluation and treatment and many other conditions that may involve contact with children and anything [that the Office of Adult Probation] believe[s] is reasonably related to this charge." The court further advised the defendant that if, following the completion of a presentence investigative report, the court determined that the sentence contemplated under the plea agreement was appropriate, the defendant would not be allowed to withdraw his guilty plea without the court's permission. When asked whether he understood, the defendant responded that he did. The defendant also indicated that he understood that he would be permitted to withdraw his plea if the court, after reviewing the presentence investigation report, determined that the sentence agreed on by the parties was not appropriate. Following this colloquy, the court accepted the defendant's guilty plea after finding that he had made it knowingly and voluntarily and with the assistance of competent counsel.

The trial court subsequently determined that the sen-

tence negotiated by the parties was appropriate, and, on March 15, 2013, the court sentenced the defendant in accordance with the terms of the plea agreement. At the time of sentencing, the court also recounted the following standard and special conditions of probation, as expressly set forth under the plea agreement: "[S]ex offender registration, sex offender evaluation and treatment through [a Connecticut Association for the Treatment of Sexual Offenders] provider," and compliance "with all recommended sex offender conditions of probation as deemed appropriate by the supervising [probation] officer." Moreover, in imposing sentence, the court emphasized the seriousness of the crime of possession of child pornography insofar as it fuels and perpetuates the "heinous" and "horrendous" sex trade that so grievously exploits and harms young children.

In August, 2015, after completing a short term sex offender treatment program for inmates, the defendant was released on parole to a transitional housing setting in Torrington. His parole was revoked almost immediately, however, after it was discovered that, just two weeks after his release, he was using a public computer to access child pornography. He was returned to prison on September 1, 2015.

On April 5, 2017, the defendant, who was still incarcerated, first met with his probation officer, Nicole Grella, via video conference. During this intake meeting, the defendant and Grella reviewed his offense, sentence and the conditions of his probation. They also discussed additional details about the defendant's life, including housing, his support network, and his concerns and anticipated needs for his impending probation. At that time, the defendant explained to Grella that he believed that he had reoffended so soon after being paroled in 2015 because of the abrupt transition from prison to community based, independent living without sufficient structure and support. The defendant further told Grella that he needed additional supervision and counseling to overcome his acknowledged addiction to child pornography and to successfully complete his period of probation.

Prior to this video conference, Grella reviewed the defendant's presentence investigation report and records. As a result of this research, Grella learned, among other things, that the defendant had committed a violent sex offense as a juvenile and that he had failed to successfully complete an inpatient sex offender treatment program at that time. Moreover, while participating in that program, the defendant exhibited "pervasive[ly] negative behavior" and admitted that he had devised a plan to be alone with one of the female staff members and to molest her. In addition, the defendant had been deemed a "high risk to sexually reoffend" on the basis of a sex offender evaluation conducted after he was sentenced to serve time in prison in 2013.

In late March, 2017, Grella spoke with the defendant's mother to discuss housing options for the defendant upon his release from prison. The defendant's mother indicated to Grella that she was in the process of moving out of state but would be able to pay for her son's housing while he remained on probation. Grella spoke with the defendant's mother again in early June, 2017, at which time she told Grella that she had secured a bed for the defendant at the same residence in Torrington where he had resided briefly following his short-lived release on parole.

Grella thereafter told the defendant that she had decided to refer him to the January Center (center), an inpatient sex offender treatment facility in Montville, for placement there upon his discharge from prison. Grella explained that the center offers the most intensive and restrictive sex offender treatment program available through the Judicial Branch's Court Support Services Division and is operated by an entity known as The Connection, Inc., which runs numerous treatment programs throughout the state. The typical length of a stay at the center, where residents live in individual rooms and participate in daily therapy, is three to six months, depending on the resident's progress. The facility is located on the grounds of the Corrigan Correctional Institution and is surrounded by a high, exterior fence topped with razor wire. Although residents of the center may not leave the facility without permission and a staff escort, the building is unlocked, and staff members are instructed not to restrain or touch a probationer seeking to leave without proper authorization. If a resident who is on probation does leave the center without such authorization, however, he or she may be charged with a violation of probation.

The defendant was initially resistant to being placed at the center, in large measure because he believed that his referral to such a restrictive treatment facility was unduly harsh and punitive. He also told Grella that his placement at the center was not warranted because his mother had secured housing for him and he had already lined up a possible employment opportunity. Over the course of several phone calls with the defendant, however, Grella explained in detail why she believed that placement at the center was the most appropriate discharge option for him. On the basis of her expertise, it was Grella's view that the conditions imposed by the center, including daily therapy sessions, would afford the defendant the best structure and opportunity for his successful reentry into the community. Grella also discussed other benefits of the defendant's placement at the center, including its minimal cost to him and his mother, and the support and assistance it would afford him when he returned to the community upon his departure from the facility, a consideration that the defendant himself had identified as critical to a successful transi-

tion. Over time, the defendant grew more agreeable to his placement at the center, and he assured Grella that he would abide by the center's rules. He also told Grella that he understood that, if he refused to comply with those rules or any other aspect of his discharge plan, he would be in violation of his probation.

On June 28, 2017, the defendant signed the conditions of his probation, thereby acknowledging his obligation to abide by them. Among the court-ordered special probationary conditions, probation officials were authorized to require the defendant to participate in a residential sex offender treatment program, and the defendant was required to complete sex offender evaluation and treatment through an approved provider and to comply with all other conditions deemed appropriate by his probation officer in view of his offense. More specifically, the defendant expressly acknowledged the requirement imposed by his probation officer that he reside and receive treatment at the "[c]enter, a secure [twenty-four] hour residential treatment facility/program," and he further agreed to "follow the . . . [c]enter's restrictions, policies and procedures until satisfactory completion of the program." Finally, the defendant acknowledged that leaving the center without permission would constitute a violation of his probation.

Upon his release from prison on July 14, 2017, the defendant commenced his placement at the center. He thereafter signed sex offender treatment and accountability agreements pursuant to which he was required to abide by the center's policies and rules, including the requirements that he "not engage in any violence, threats or intimidation" or "in any behavior that adversely [a]ffects the treatment or confidentiality of any other client," and that he "abide by all of the rules of [t]he . . . [c]enter in order to [coexist] . . . with other clients, staff members and volunteers." He also agreed to "be respectful to all staff and clients [of the center]," including "allowing [them] personal space, not getting involved in other client's concerns or staff member's undertakings, not swearing, being aware of how [his] behavior or words can make people feel uncomfortable, analyzing situations [that] may trigger anger before reacting, and not causing . . . disturbances within the . . . [c]enter community." In addition, the defendant acknowledged that any violation of these rules would result in his being issued a ticket and in notification to his probation officer. Finally, the defendant was informed that repeated violations could lead to his immediate dismissal from the center.

Although the defendant completed the initial phase of his treatment program, on October 30, 2017, before completing that program, he was discharged from the center because of his failure to adhere to various conditions established by the center for continued placement

there. According to a discharge summary prepared by the center, the defendant's treatment was terminated as a result of his "[noncompliance] with program rules and expectations and disorderly conduct" after receiving multiple disciplinary tickets for engaging in a pattern of wilful disobedience and disrespect that adversely affected the therapeutic environment at the center, repeatedly becoming confrontational toward staff, verbally threatening to harm staff, propping open the door to his room when it was supposed to be closed and locked,[2] and not completing his assigned chores. On one of those occasions, the center staff called the state police to respond to the defendant's behavior. Shortly thereafter, the staff concluded that they had exhausted all efforts to work productively with the defendant and that he had become "a safety concern to himself and the community."

The defendant subsequently was charged with violating his probation for failing to complete sex offender treatment at the center. The defendant moved to dismiss the charge, claiming that the probationary condition requiring him to successfully complete the center treatment program violated his rights under the due process clause of the fourteenth amendment to the United States constitution.[3] In support of this claim, the defendant asserted that the conditions at the center were so severe and restrictive as to constitute the functional equivalent of incarceration and, therefore, were impermissibly onerous as a matter of law. The defendant further claimed that, even if his placement at the center was not tantamount to incarceration, the restrictions imposed on him there nevertheless violated his right to due process because, in light of his background and offense history, those restrictions were not justified as reasonably related to his rehabilitation. Finally, the defendant asserted a third due process violation, namely, that he had been denied adequate notice of his placement at the center when the trial court sentenced him and placed him on probation.

In addition, the defendant maintained that his referral to the center violated his right to equal protection under the federal constitution[4] because the referral was predicated on his status as a homeless person. Finally, the defendant claimed that his placement at the center violated the constitutional prohibition against cruel and unusual punishment[5] because he was placed at the center, and thereby subjected to its punitive conditions, on account of his homelessness.[6]

Following an evidentiary hearing, the trial court, *Danaher, J.*,[7] issued a thorough memorandum of decision in which the court credited the state's witnesses, rejected each of the defendant's claims and, accordingly, denied his motion to dismiss. With respect to the defendant's contention that his placement at the center constituted a due process violation because it was tanta-

mount to incarceration, the trial court stated: "[T]he defendant was not incarcerated at the [c]enter. The evidence presented at the hearing . . . makes clear that a probationer leaving the . . . [c]enter would not be charged with escape. The . . . [c]enter is not staffed by correctional officers. It does not contain cells; it has individual rooms. Residents at the . . . [c]enter leave for religious services and medical appointments. Although the . . . [c]enter is on the grounds of a correctional facility and . . . is surrounded by a fence topped with barbed wire, if a probationer referred to the . . . [c]enter elected to leave without permission, that person could walk through the gate or have the gate opened for them. The staff members at the . . . [c]enter are specifically instructed not to touch or try to restrain a probationer seeking to leave the [c]enter without permission. It is true that, in the foregoing event, the probationer would be charged with violation of probation, but the latter fact does not compel the conclusion that referral to the . . . [c]enter is 'essentially' incarceration."

In rejecting the defendant's claim that his placement at the center violated his right to due process because his referral there was unreasonable, the trial court explained: "[T]he Office of Adult Probation engaged in a careful process that led to the conclusion that referral to the . . . [c]enter was appropriate for this defendant. Indeed, the defendant specifically requested additional help in effecting a transition from a correctional institution due to his inability to refrain from obtaining child pornography. He was, after an analysis, designated as a high risk to reoffend, and the . . . [c]enter was a placement designed to respond to such individuals. It offered group treatment and daily individual treatment. It offered help to those seeking employment and assistance obtaining housing and other services. The defendant's placement at the . . . [c]enter was not in any way arbitrary; it was a carefully selected, eminently reasonable placement for a sex offender such as this defendant." The court further explained: "[T]he evidence adduced at the hearing fully supports the court's finding that the defendant's placement at [the] [c]enter was based on empirical evidence, including an understanding of the defendant's offenses and offense history; his rapid reoffense after his initial release in 2015; his own request for additional assistance in effecting a transition; the nature of the . . . [c]enter; and the programs available at [the] [c]enter for high risk offenders. The defendant's placement at the . . . [c]enter was hardly unreasonable; on the contrary, it was completely appropriate. That placement comports with all requirements that must apply to a condition of probation."

Finally, the trial court rejected the defendant's equal protection and cruel and unusual punishment claims, both of which were predicated on his contention that he was referred to the center on the basis of his home-

lessness, because the testimony adduced at the hearing on the motion to dismiss established that he had not been placed there for that reason. Rather, the court found that, "although homelessness is a factor in deciding whether to place a [probationer] in the . . . [c]enter, such placement is based primarily on whether the probationer is a high risk sex offender, not on whether the [probationer] is homeless," and, further, in the present case, the defendant "was not placed at the . . . [c]enter because he was homeless; he was placed at the . . . [c]enter because he is a high risk offender."

Thereafter, the trial court found that the defendant had violated his probation by virtue of his improper actions and conduct at the center, and his failure to complete the treatment program there due to that misconduct. The court revoked the defendant's probation and sentenced him to a term of imprisonment of six years, execution suspended after two years, followed by four years of probation. This appeal followed.[8]

In this court, the defendant renews the constitutional claims that he raised in the trial court, which we address in turn. Before doing so, however, we briefly summarize the principles relating to probation that guide our analysis of the defendant's claims. "[P]robation is, first and foremost, a penal alternative to incarceration . . . . [Its] purpose . . . is to provide a period of grace in order to aid the rehabilitation of a penitent offender; to take advantage of an opportunity for reformation which actual service of the suspended sentence might make less probable. . . . [P]robationers . . . do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions. . . . These restrictions are meant to [ensure] that the probation serves as a period of genuine rehabilitation and that the community is not harmed by the probationer's being at large." (Internal quotation marks omitted.) *State* v. *Faraday*, 268 Conn. 174, 180, 842 A.2d 567 (2004).

Nevertheless, because probation is itself "a conditional liberty," once granted, it is "a constitutionally protected interest"; (internal quotation marks omitted) *State* v. *Orr*, 199 Conn. App. 427, 434–35, 237 A.3d 15 (2020); and, therefore, "[a]ny restriction . . . [on] a probationer's otherwise inviolable constitutional rights can be justified only to the extent actually required by legitimate demands of the probation process in any given case." *State* v. *Smith*, 207 Conn. 152, 166, 540 A.2d 679 (1988). In other words, principles of due process require that probationary conditions must be reasonably related to the purposes of probation, with appropriate regard for the background and circumstances of the individual probationer, a requirement that is also mandated statutorily under General Statutes § 53a-30.[9] In view of the nature and goals of probation, however,

and because any number of probationary conditions or combinations thereof are likely to be suitable in any particular case, the trial court "has an exceptional degree of flexibility in determining [the] terms [of probation]"; (internal quotation marks omitted) *State* v. *Silas S.*, 301 Conn. 684, 692, 22 A.3d 622 (2011); and we therefore review those terms for abuse of discretion only. See id. Thus, "[i]f it appears that the trial court reasonably was satisfied that the terms of probation had a beneficial purpose consistent with the defendant's reformation and rehabilitation, then the order must stand. . . . In reviewing the issue of discretion, we do so according it every reasonable presumption in favor of the trial court's ruling." (Internal quotation marks omitted.) Id.

"The success of probation as a correctional tool is in large part tied to the flexibility within which it is permitted to operate. . . . In this regard, modifications of probation routinely are left to the [O]ffice of [A]dult [P]robation. When the court imposes probation, a defendant thereby accepts the possibility that the terms of probation may be modified or enlarged in the future pursuant to . . . § 53a-30. . . . To this end, probation officers shall use all suitable methods to aid and encourage [a probationer] and to bring about improvement in his [or her] conduct and condition." (Citations omitted; footnote omitted; internal quotation marks omitted.) *State* v. *Faraday*, supra, 268 Conn. 180–82. Accordingly, it is well established that, depending on the circumstances of a particular case, the Office of Adult Probation properly may impose conditions of probation that place significant restrictions on a probationer's liberty during the term of his or her probation, if such restrictions are reasonably necessary. See, e.g., *State* v. *Reid*, 204 Conn. 52, 55, 526 A.2d 528 (1987). Of course, a defendant may challenge the probationary condition he or she is alleged to have violated on the ground that it was unreasonable and, therefore, unlawful. See *State* v. *Smith*, 255 Conn. 830, 840, 769 A.2d 698 (2001); see also Practice Book § 41-8 (8) (defendant may file motion to dismiss charge on ground that "the law defining the offense charged is unconstitutional or otherwise invalid"). Indeed, "[e]ven prior to the violation of probation hearing, if an individual on probation believes that the [O]ffice of [A]dult [P]robation [has] imposed an unreasonable condition, he may request a hearing pursuant to . . . § 53a-30 (c)." *State* v. *Smith*, supra, 255 Conn. 840. If a condition of probation is determined to be invalid, a revocation of probation predicated on a violation of that condition also is unlawful. See, e.g., *State* v. *Cooley*, 3 Conn. App. 410, 415, 488 A.2d 1283 ("[i]f . . . the condition [of probation] serves no rehabilitative purpose and there is undisputed evidence that the condition was unnecessary at its inception, or was without any beneficial purpose as of the date of the hearing, reasonableness of a revocation of the proba-

tion is lacking"), cert. denied, 196 Conn. 805, 492 A.2d 1241 (1985).

Finally, "in determining whether a condition of probation impinges unduly [on] a constitutional right [in any particular case], a reviewing court should evaluate the condition" to ensure that it is "reasonably related to the purposes of [probation]." (Internal quotation marks omitted.) *State* v. *Smith*, supra, 207 Conn. 170. "Consideration of three factors is required to determine whether [such] a reasonable relationship exists: (1) the purposes sought to be served by [the] probation[ary] [condition]; (2) the extent to which constitutional rights enjoyed by law-abiding citizens should be accorded to probationers; and (3) the legitimate needs of law enforcement." (Internal quotation marks omitted.) Id. Upon application of these principles, we conclude that the trial court properly rejected the defendant's claims.

We first address the defendant's contention that, contrary to the determination of the trial court, his placement at the center violated his right to due process because it was the functional equivalent of incarceration.[10] In support of this contention, the defendant focuses on the highly restrictive nature of the conditions at the center, in particular, the facts that center residents may leave the facility only with permission and an escort, that relatively strict security protocols are followed and enforced by center staff, and that the facility is situated on the grounds of a correctional institution with a fence surrounding it.[11] We disagree with the defendant's claim.

It is axiomatic that "[t]he . . . object of imprisonment is confinement. Many of the liberties and privileges enjoyed by other citizens must be surrendered by the prisoner. An inmate does not retain rights inconsistent with proper incarceration." *Overton* v. *Bazzetta*, 539 U.S. 126, 131, 123 S. Ct. 2162, 156 L. Ed. 2d 162 (2003). Probationers, on the other hand, are afforded a conditional liberty that is dependent on their adherence to certain specified limitations on the freedoms they otherwise would enjoy, without restriction, if they were not subject to a criminal sanction. See, e.g., *Griffin* v. *Wisconsin*, 483 U.S. 868, 873–75, 107 S. Ct. 3164, 97 L. Ed. 2d 709 (1987). Generally speaking, the infringement on liberty caused by an order of probation is considerably less intrusive than the extreme restrictions attendant to incarceration. See, e.g., *United States* v. *Nachtigal*, 507 U.S. 1, 5, 113 S. Ct. 1072, 122 L. Ed. 2d 374 (1993). Nevertheless, as we previously noted, conditions of probation that are reasonably necessary and appropriate for the rehabilitation of the probationer and the safety of the community are lawful and proper, even though they place significant restrictions on the probationer's liberty during the term of his or her probation. See, e.g., *Blanton* v. *North Las Vegas*, 489 U.S. 538, 542, 109 S. Ct. 1289, 103 L. Ed. 2d 550 (1989) ("pro-

bation . . . may engender a significant infringement of personal freedom" (internal quotation marks omitted)). Thus, depending on the circumstances of a particular case, probation may "involve serious restraints on a probationer's [lifestyle], associations, movements and activities." *State* v. *Reid*, supra, 204 Conn. 55. "Indeed, conditions [of probation] may appear to the defendant [to be] more onerous than the sentence of confinement [that] might be imposed." (Internal quotation marks omitted.) Id., 55 n.2.

In the present case, the trial court's factual findings, which are unchallenged, demonstrate that, although the restrictions imposed on persons receiving treatment at the center are by no means insignificant, they are appreciably less onerous than those placed on prison inmates, and, accordingly, those findings support the court's conclusion that residency at the center is materially different from confinement in a prison. As we noted previously, the center contains individual rooms rather than cells, residents are not locked in their rooms, and, in further contrast to prison, the center itself is not locked. Indeed, residents may leave the facility with permission and an escort, and, even if a resident seeks to leave the facility without permission, center staff are directed not to restrain the individual as he or she is leaving, and he or she will not be charged with the crime of escape. To be sure, the center's treatment program is both restrictive and structured. But residents there retain a number of important rights and privileges that are indisputably unavailable to incarcerated individuals. We therefore agree with the trial court that the defendant's placement at the center for a period of months is not tantamount to a term of imprisonment.[12]

In this regard, we are aware of only one occasion in which this court has held that a person who was not imprisoned in a correctional facility nevertheless was confined under circumstances tantamount to incarceration. In *Connelly* v. *Commissioner of Correction*, 258 Conn. 394, 780 A.2d 903 (2001), the petitioner, William A. Connelly, was acquitted of kidnapping and assault by reason of lack of capacity due to mental disease or defect (insanity) and committed to the custody of the Commissioner of Mental Health for a period of ten years, subject to periodic review by the Psychiatric Security Review Board. Id., 399. For the duration of his commitment, Connelly was confined at Whiting Forensic Institute (Whiting) in Middletown, a maximum security facility for the treatment of violent offenders. Id., 405–406. Several years after his commitment and while still a patient at Whiting, Connelly filed a petition for a writ of habeas corpus, claiming that he was entitled to a new trial because the record did not affirmatively establish that he had been advised of his right to a jury trial. Id., 400. The habeas court agreed with Connelly and awarded him a new trial. Id. After a trial at which

Connelly did not raise an insanity defense, a jury found Connelly guilty of the kidnapping and assault charges, and he was sentenced to a total effective prison term of forty years. Id.

Thereafter, Connelly filed another habeas petition seeking credit toward his forty year sentence for the period of time that he had been confined at Whiting pursuant to the commitment order following his insanity acquittal. Id., 401. The habeas court again agreed with Connelly's claim and ordered the Commissioner of Correction to grant Connelly credit toward his sentence for the period of his confinement at Whiting. Id., 402. We affirmed the judgment of the habeas court, explaining that, "[a]lthough the *purpose* of an order of commitment issued as a result of an insanity acquittal is significantly different from that of a prison sentence imposed as a result of a criminal conviction . . . the *effect* of such a commitment on the acquittee is no less a deprivation of liberty than that of a prison sentence. Indeed, the United States Supreme Court has aptly characterized the involuntary confinement for treatment of mental illness as a massive curtailment of liberty. . . . In fact, [t]he United States Supreme Court has recognized involuntary commitment to a mental institution . . . as involving more than a loss of freedom from confinement . . . due to its stigmatizing consequences, and the potential exposure to invasive, compulsory medical and psychiatric treatment." (Citations omitted; emphasis in original; internal quotation marks omitted.) Id., 405. We further explained that such a "loss of liberty is all the more profound when the institution to which the patient has been committed is a maximum security facility such as Whiting." Id., 405–406. Finally, we observed that a sentenced prisoner who is transferred from a correctional institution to Whiting for treatment is entitled to full credit toward his sentence for the time spent at Whiting. Id., 406.

The present case is readily distinguishable from *Connelly* because, as we have explained, placement at the center is not akin to imprisonment, let alone is it the equivalent of confinement in a maximum security facility. Thus, our reasoning in *Connelly* and our resolution of that case simply are inapplicable to the present case, which presents an entirely different set of relevant circumstances. Moreover, as the trial court observed, the fact that a probationer placed at the center may be charged with violating probation for leaving the center without permission does not alter the conclusion that placement at the center is not functionally the same as incarceration, as a probationer is always subject to being charged with a probation violation whenever he or she fails to comply with a probationary condition. See, e.g., *State* v. *Reid*, supra, 204 Conn. 56–57.

The defendant also asserts that his placement at the center was not reasonably related to the purposes of

probation because the factors that Grella considered in determining the sex offender treatment program most appropriate for the defendant militated against a placement as restrictive as the center. To support his claim that Grella reasonably could not have concluded that his placement at the most restrictive treatment sex offender treatment facility available was warranted, the defendant cites his positive work and disciplinary history in prison, his completion of a short-term sex offender treatment program while incarcerated, and the fact that his mother had secured housing for him upon his release from prison. We are not persuaded.

As we have explained, the Office of Adult Probation has wide latitude to impose conditions on probationers that serve "to foster the offender's reformation and to preserve the public's safety . . . ." *State* v. *Smith*, supra, 207 Conn. 168. Of course, this includes the authority to require a probationer to undergo sex offender treatment when such treatment is reasonably necessary; see, e.g., *State* v. *Smith*, supra, 255 Conn. 844 (sex offender treatment was "a key component of the [defendant's] rehabilitative process because it was directly connected to one of the underlying crimes to which the defendant had pleaded guilty"); see also *State* v. *Thorp*, 57 Conn. App. 112, 117, 747 A.2d 537 (under § 53a-30, sex offender treatment may be imposed as condition of probation, even when it was not explicitly included in court-ordered terms of probation), cert. denied, 253 Conn. 913, 754 A.2d 162 (2000); as well as to require that a probationer adhere to stringent residential conditions and rules. See, e.g., *State* v. *Agli*, 122 Conn. App. 590, 596, 1 A.3d 133 (probation officer properly required probationer convicted of sex offense to adhere to strict curfew at shelter as condition of probation), cert. denied, 298 Conn. 920, 4 A.3d 1229 (2010).

We agree with the trial court that the defendant's placement at the center furthered the rehabilitative and public safety purposes of probation. Before deciding where to refer the defendant, Grella reviewed the defendant's record and spoke with him on a number of occasions to ascertain his needs and to select an appropriate sex offender treatment program tailored to those needs, with due regard, of course, for community safety. Among other things, Grella learned that the defendant had committed a violent sex offense as a juvenile[13] and that he had failed to complete sex offender treatment deemed necessary in light of the offense. In addition, Grella was aware that the defendant had reoffended within days of his release on parole two years earlier despite his having completed a sex offender treatment program in prison. Furthermore, the defendant himself believed that he had not been afforded adequate supervision and guidance following his release on parole and that he needed additional support in order to overcome his admitted addiction to child pornography and to

avoid offending again. Based on her eight years of experience as a probation officer, Grella reasonably concluded that the center's intensive program of individual and group therapy, administered in the structured environment of a residential facility and coupled with the housing and employment assistance offered by the center at the time of the defendant's discharge from the center, was likely to afford the defendant his best opportunity to successfully address his child pornography addiction. It also was reasonable for Grella to conclude that, because the defendant presented a high risk of reoffending, legitimate law enforcement interests would best be served by placing the defendant at a restrictive facility like the center. Cf. *State* v. *Crouch*, 105 Conn. App. 693, 701–702, 939 A.2d 632 (2008) (rejecting defendant's claim that requiring sex offender treatment as condition of probation violated his right to due process because facts of his underlying conviction of risk of injury to child suggested that sex offender evaluation and treatment were conditions of probation that were "reasonably related to the defendant's reformation" and to "the legitimate purpose of law enforcement in rehabilitating him and in protecting the community").

The defendant asserts that, because a less restrictive sex offender treatment program would have sufficed to accomplish probation's dual goals of rehabilitation and public safety, the Office of Adult Probation was obligated to have selected such a program for him. As a general rule, the beneficial rehabilitative purpose of probation will be best served when the probationer is afforded the opportunity to succeed under conditions that do not limit or restrict his liberty to a greater extent than necessary to accomplish that end. Probationary conditions, however, must also account for the community's legitimate safety concerns. Thus, we will not second-guess the imposition of probationary conditions, as long as they may be justified as reasonably necessary to accomplish the purposes of probation. Cf. *State* v. *Faraday*, supra, 268 Conn. 180–82 (probation officer is responsible for determining conditions that will assist probationer in achieving positive change in behavior). As we previously stated, we must afford the probation officer such flexibility because of the many variables involved in the determination of what set of conditions is best suited to a particular probationer. See *State* v. *Misiorski*, 250 Conn. 280, 287–88, 738 A.2d 595 (1999). Because Grella reasonably concluded that the defendant's placement at the center was the best, most appropriate option under the circumstances—not *despite* the restrictive conditions there but *because* of them—that probationary condition did not offend principles of due process.

The defendant next claims that subjecting him to the highly restrictive conditions at the center violated his right to equal protection because he was placed there

due to his status as a homeless person. We need not consider the substantive issue raised by the defendant's claim, that is, whether the right to equal protection bars the placement of a probationer at the center on the basis of his or her homelessness, because his claim founders on the trial court's factual finding—fully supported by the record—that he was not referred there for that reason. Moreover, it is difficult to see how the defendant could fairly be characterized as homeless in view of the fact that his mother had secured housing for him upon his release from prison. Because the defendant's equal protection claim is belied by the record, the claim fails.

The defendant finally argues that the condition of probation requiring him to attend sex offender treatment at the center violated his eighth amendment right against cruel and unusual punishment because assigning him to the most restrictive treatment facility in the state was grossly disproportionate given his background and offense history.[14] The defendant cannot prevail on this claim because of our determination, explained in connection with our rejection of his due process claim, that his placement at the center was reasonably related to the purposes of probation: a condition of probation that is reasonably necessary to accomplish the legitimate goals of probation cannot be unduly harsh. Accordingly, the defendant's eighth amendment claim also lacks merit.[15]

The judgment is affirmed.

In this opinion the other justices concurred.

* The listing of justices reflects their seniority status on this court as of the date of oral argument.

** January 7, 2021, the date that this decision was released as a slip opinion, is the operative date for all substantive and procedural purposes.

[1] General Statutes § 53a-196e provides in relevant part: "(a) A person is guilty of possessing child pornography in the second degree when such person knowingly possesses (1) twenty or more but fewer than fifty visual depictions of child pornography . . . ."

[2] The defendant would prop open the door to his room during required therapy sessions, even though the door was supposed to be closed and locked at that time so as to render the room inaccessible to him during such sessions.

[3] The due process clause of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ." U.S. Const., amend. XIV, § 1.

[4] The equal protection clause of the fourteenth amendment to the United States constitution provides in relevant part: "No State shall make or enforce any law which shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., amend XIV, § 1.

[5] The eighth amendment to the United States constitution provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., amend. VIII.

The eighth amendment's prohibition against cruel and unusual punishment is made applicable to the states through the due process clause of the fourteenth amendment to the United States constitution. See, e.g., *Tuilaepa* v. *California*, 512 U.S. 967, 970, 114 S. Ct. 2630, 129 L. Ed. 2d 750 (1994).

[6] Several other claims that the defendant raised in the trial court are not the subject of this appeal.

[7] Unless otherwise noted, all references hereinafter to the trial court are to Judge Danaher.

[8] The defendant appealed to the Appellate Court from the judgment of

the trial court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

[9] General Statutes § 53a-30 provides in relevant part: "(a) When imposing sentence of probation or conditional discharge, the court may, as a condition of the sentence, order that the defendant . . . (17) satisfy any other conditions reasonably related to the defendant's rehabilitation. . . .

(b) When a defendant has been sentenced to a period of probation, the Court Support Services Division may require that the defendant comply with any or all conditions which the court could have imposed under subsection (a) of this section which are not inconsistent with any condition actually imposed by the court. . . ."

[10] As the defendant acknowledges, the term "incarceration" is not defined in our statutes, and neither he nor the state has advocated for a particular definition of the term. For present purposes, therefore, we, like the parties, use the term in accordance with its commonly understood meaning, namely, involuntary confinement in a jail or a prison. See *Magee* v. *Commissioner of Correction*, 105 Conn. App. 210, 215, 937 A.2d 72 (imprisonment "commonly and primarily refers to a condition of physical confinement, usually by means of coercion, in a prison"), cert. denied, 286 Conn. 901, 943 A.2d 1102 (2008).

[11] Although situated on the grounds of a correctional institution, it is undisputed that the defendant was not in the custody of the Commissioner of Correction while he resided at the center.

[12] The defendant also makes brief reference to an additional alleged due process violation, namely, that he did not receive adequate notice at the time of his plea and sentencing that he could be placed at a facility as restrictive as the center. The trial court rejected this claim and, to the extent that the defendant has renewed that claim on appeal, so do we. As we explained, at the plea hearing, the court, *Ginocchio, J.*, advised the defendant that his probation officer likely would impose "many other conditions," including sex offender evaluation and treatment, that the officer reasonably believed were appropriate in light of the nature of his offense. Additionally, at the time of sentencing, the court ordered as a special condition of probation that the defendant complete "sex offender evaluation and treatment through [an approved] provider" and that he "[c]omply with all recommended sex offender conditions of probation as deemed appropriate by the supervising [probation] officer." Furthermore, under § 53a-30, a probation officer has broad discretion to impose reasonable probationary conditions and, if warranted, to require that a probationer participate in a sex offender treatment program at a residential facility like the center, which, as the trial court expressly found, "provide[s] community based treatment for the treatment of sex offenders." Finally, the defendant himself recognized that he needed an intensive and structured treatment program if he was to successfully address his addiction to child pornography and to avoid reoffending. As we explain more fully hereinafter, in light of the defendant's addiction and his offense history and likelihood of recidivism, his placement at the center fell squarely within the discretion afforded his probation officer to impose such conditions. Consequently, the defendant's claim that he was not on notice that he could be placed at a residential facility like the center is devoid of merit.

[13] We disagree with the defendant's contention that it was improper for Grella to have considered his violent sex offense as a juvenile in referring the defendant to the center. Although at least one court has held that a probationary condition may not be predicated solely on a juvenile conviction; see *United States* v. *Worley*, 685 F.3d 404, 408–409 (4th Cir. 2012); in the present case, the defendant's juvenile record was only one of a number of considerations that led Grella to conclude that the defendant should be placed at the center. The fact that the defendant had committed a violent sex offense as a juvenile, and then failed to complete sex offender treatment following that offense, was certainly relevant to Grella's determination as to the appropriate conditions of probation, and we see no reason why Grella was prohibited from factoring that information into her decision.

[14] The defendant apparently did not raise this argument in the trial court in support of his eighth amendment claim; he maintained, rather, that it constituted cruel and unusual punishment to place him at the center due to his homelessness. We see no reason, however, not to address the merits of the eighth amendment argument he now makes in this court.

[15] In his reply brief, the defendant concedes that, under the circumstances presented, an adverse decision on his due process claim also would require an adverse decision on his eighth amendment claim.